Filed 7/6/23

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>JOEL MADRIGAL,<br><br>    Defendant and Appellant. | H046577<br>(Santa Clara County<br> Super. Ct. No. C1359219) |

Defendant Joel Madrigal was among a group of four or five males who got out of a van and attacked a man on a sidewalk. The attackers beat the man, robbed him, and returned to the van for their escape. One of the attackers stabbed the victim with a knife multiple times during the attack, and he died soon thereafter. A jury found Madrigal guilty of first degree murder and second degree robbery but acquitted him of participation in a criminal street gang and found gang allegations not true. The trial court imposed an aggregate term of 100 years to life consecutive to 12 years in prison.

Among other claims, Madrigal contends the retroactive application of Senate Bill No. 1437, which added elements to the definition of felony murder, requires us to reverse the first degree murder conviction. Madrigal further contends that after defense counsel subpoenaed audio recordings of the van driver's jailhouse phone calls, the trial court erred by refusing to review the calls or release them to the defense.

For the reasons below, we conclude these claims are meritorious. We will reverse the judgment, vacate the first degree murder conviction, conditionally reverse the robbery conviction, and remand for further proceedings.

# I. FACTUAL AND PROCEDURAL BACKGROUND

## A. Facts of the Offenses

In January 2013, Madrigal and three or four other men got out of a van and attacked Donald Harvey on the sidewalk. One of the attackers stabbed Harvey multiple times, killing him. The men stole $25 to $30 from Harvey and returned to the van for their escape. Alicia Pacheco, Madrigal's girlfriend at the time, was driving the van. The prosecution alleged Madrigal and the other attackers were active participants in the Norteño criminal street gang.

### 1. The Attack and Robbery

Harvey's body, surrounded by blood, was found on the side of Southside Drive in a residential area of San Jose. Victor Vazquez witnessed the attack from his property across the street. He was standing outside with a friend when he heard some yelling and screaming from across the street. Vazquez saw a group of four or five men hitting and kicking a man while holding him against the front grill of a vehicle parked on the street. It looked to Vazquez like all four or five of the attackers were kicking and throwing punches at the man. Some of them took turns holding the man. The man was screaming and trying to get away from them. Vazquez never saw any weapons.

Vazquez and his friend started to approach the attackers while yelling, "Hey," to move them away from the man being attacked. The attackers ran away, and the man, who had been leaning against the front of the parked vehicle, dropped to the ground. Vazquez asked the man if he was okay, but the man did not respond. When Vazquez saw blood on the ground, he called 911. Vazquez then saw a van driving away from the area. He did not recognize any of the attackers, and he could not see their faces well enough to describe them to the police.

Two of Harvey's friends testified that they were drinking with him at a nearby liquor store shortly before the attack. Harvey, who had some cupcakes and a drink with him, left on foot to drop the items off somewhere while the two friends stayed at the

2

liquor store. Five or ten minutes later, one of the two friends spotted four men beating up Harvey down the street about a block and a half away. The two friends ran down the street to defend Harvey, but the attackers ran away before the friends could get there. They stayed with Harvey and tried to talk to him while another man called 911. One of the two friends saw a green van driving by. Someone inside the van opened a door, four men hopped into it, and the van drove away. The friend heard the attackers yell "Norte" twice as the van was driving away. The friend testified that Harvey had had money on him. The friend testified that he did not see any of the attackers going through Harvey's pants pockets, but two pockets were "sticking out" or "looked into."

When the police arrived, Harvey was lying on the sidewalk, and he was unresponsive with a large amount of blood coming from his body. Police found a screwdriver and a cord lock on the ground, and crime scene photos showed four or five coins lying in the gutter.

Various maps showed the surrounding area. The southwest end of Southside Drive stops at Monterey Street in a T-shaped intersection. From there, Southside Drive continues northeast in a straight line and intersects with Hope Street. Harvey's body was found on the side of Southside Drive near the intersection of Hope Street. Continuing another block northeast, Southside Drive intersects with Water Street.

After canvassing residences in the area for video cameras, police obtained two videos recorded at the time of the assault. A video with a time stamp around the time of the attack showed a van consistent with Pacheco's van pausing momentarily on Water Street at an intersection south of Southside Drive before proceeding south. A second video with a time stamp beginning just prior to the time of the attack was recorded from two cameras at a guard shack on Southside Drive across from Hope Street. The video images were too dark to show the details of the vehicles that appear in them, but the lights from various vehicles could be seen as the vehicles drove back and forth on Southside Drive. One portion of the video showed a set of vehicle lights traveling

3

eastbound on Southside Street. A detective testified that the shape of that vehicle was "consistent with the shape or silhouette of a van" and that it had "lighting configurations consistent with" Pacheco's van. The video also showed the silhouettes of four persons walking westbound on Southside Drive, followed by the silhouette of at least one person running eastbound on Southside Drive about 40 seconds later. One set of vehicle lights in the video was consistent with a vehicle turning into Hope Street and waiting for about a minute before turning back onto Southside Drive, but the video images were obscured by headlight glare from one or more vehicles.

As the prosecution played the videos for the jury, a detective described their contents. The detective testified that "based on the interviews" of the witnesses he had done, the videos show a van turning onto Hope Street, making a U-turn, waiting for some time, and then driving eastbound down Southside Drive. As to the vehicle turning onto Hope Street, the detective testified, "I've seen this video multiple times, and I know for a fact that's what occurs. But I didn't see it as you played it just now." The videos were not detailed or accurate enough to identify any of the persons walking or running by. On cross-examination, the detective conceded that the quality of the video taken from the guard shack on Southside Drive was "not the best."

An autopsy of Harvey's body showed he had suffered five stab wounds, as well as multiple abrasions on the face resulting from blunt force. A forensic pathologist for the prosecution testified that Harvey died as the result of blood loss through a stab wound in the back of his left thigh severing the femoral artery. The fatal wound was five and a half inches deep, an inch and a half long, and the artery was completely severed. The wound was "oblique, linear, had a sharp upper end, it had a wide, blunt lower end." None of the five stab wounds could have been inflicted by the screwdriver that was found at the scene. The forensic pathologist testified it was possible that all five wounds were inflicted with the same knife, and while it was likely that four of them were inflicted with the same knife, one of the wounds (not the fatal wound) was an "odd duck" that was

4

"very different" from the others. As to whether it was likely the same knife was used to inflict that wound, he testified that the wound was "too different." He added, "I can't say it's impossible, but it's a very different wound." A forensic pathologist for the defense testified that she could not determine whether the wounds were caused by more than one knife.

### 2. *Police Interview of Madrigal in May 2013*

In May 2013, Madrigal told the police he had information about the attack. In a video recorded interview, Madrigal stated he was in the van with several other people when four males got out to rob someone. Madrigal described the person who did the stabbing as a 16- or 17-year-old "little kid" who went to Andrew Hill High School.[1] He was about five feet and eight inches tall with long dark hair, and he weighed about 140 or 150 pounds. The stabber was bragging about it.

Madrigal identified two of the other males as "Temper" (later identified as Alex Barrientos) and "Boogie" (later identified as Ceasar Torres). He could not recall the name of the third male, but he thought it was something like "Enrique", "Enrico", or "Emilio" (later identified as Enrique Martinez). Madrigal said some of the males were "associated with" a Northerner gang called Feldspar. The males "cliqued up with Feldspar" or "chill with" them.

As for himself, Madrigal claimed he had stayed in the van with three females. He identified two of them as Jasmine (later identified as Jasmine Nieto) and Alicia (later identified as Alicia Pacheco, also known as Alicia Pazos, Torres's sister). Alicia was driving the van.

The police asked Madrigal if he knew in advance whether the others were planning on doing anything. Madrigal responded, "We're just gonna get beer and—and

---

[1] The police later identified Moises "Lobo" Hernandez as a person fitting this description. His DNA matched a DNA sample taken from the cord lock that was found at the scene of the attack.

fuckin' they were acting stupid like. . . . where fuckin' anybody could get it. I'm like, 'You guys are fuckin' off the hook man.' " When asked if that meant "maybe steal some shit," Madrigal responded, "Yeah," and added that "they do a lot of beer runs," and Madrigal was the one who had already bought beer earlier in the evening.

The police tried to establish when the group had purchased beer and where they got it. In a series of confusing exchanges about how many times they had gotten beer and where they went for it, Madrigal stated that they had done multiple beer runs but that the attack occurred when they were on the way to the liquor store during one of the later runs. He added, "But these little fuckers have fuckin' intentions and we thought they were just gonna pull a beer run, right? So we fuckin' just went to the corner. These little —whatever the fuck they were doing they . . . I heard it was like a old—old white guy dude." Madrigal stated that they didn't make it to the beer run because "they started beating up that guy." Because they all lived in the same neighborhood, Madrigal's reaction was "like, 'Dude, what the fuck are you guys doing?' " When the police asked again about what the others had said they were planning to do, Madrigal responded that one of them had said it was a beer run, and when they came back from the attack, "[W]e were like, 'What the fuck? Was it a scrap you guys . . . .'," whereupon they fled from the scene in the van.

When the police asked why they had attacked the victim, Madrigal responded, "They were just like, 'Anybody can get it. We wanted to test it.' You know, and I was like, 'What the fuck?' " When the police asked what "get it" meant, Madrigal explained that when he was young and gang banging, "I wouldn't fuckin' like beat up random people" but he would walk around and "talk shit." He then added, "So I just think it was this—they were just fuckin' being dumbass little fucks and—and one of them fuckin' just wasn't fuckin' satisfied with that."

Madrigal then stated that he saw the attack happen while he was in the van with the females. It looked like "somebody getting jumped in the street," after which they ran

6

back to the van and hopped in.  The person who did the stabbing was smiling and laughing in the back of the van.  But Madrigal did not know anybody had gotten stabbed until they got back to the house and the stabber bragged about it.  When the police asked if the stabber had the knife on him, Madrigal responded, "Yeah.  They had the knife.  They kept it.  It was like a Rambo knife."  Madrigal said Torres added, "Fuck, I dropped the screwdriver."  Madrigal described the knife as "black on black" and "[L]ike a bone crusher dude."  Madrigal clarified that he saw the "youngster" with the knife, and added that the males had blood on their clothes.  Madrigal told them they should change their clothes and told Pacheco, "I better not go to fuckin' prison for this shit."

Madrigal said he asked them why they attacked the victim, and they responded that they got $25.  Madrigal did not see the money.  The police asked Madrigal, "Who told you they stole the money?"  Madrigal responded, "[F]uckin' Temper [Barrientos] little dumbass."

### 3.  Police Interview of Madrigal on June 6, 2013

The police interviewed Madrigal again on June 6, 2013.  The police asked again about the group's plan prior to the attack.  Madrigal stated, "I was planning on buying beer."  He said it changed from him buying beer to a doing a "beer run" when they were on the way to the store, but nobody else had any money to put in, so Barrientos responded, "[L]et's do a beer run fucker."  Madrigal explained he would "just buy me a couple of tall cans" and let them get their own beer since they did not have any money.  Madrigal stated he thought it was still a beer run when they were getting out of the van.

Madrigal stated again that the stabber was "the little youngster" who went to Andrew Hill High School.  The police took a buccal swab from Madrigal's mouth and told him they wanted to test it against DNA found on the screwdriver that was left at the scene of the attack.  The police asked Madrigal if he had ever touched a screwdriver before, and Madrigal said he had used one at the house.  The police told Madrigal the

screwdriver they had found at the scene of the attack was large, and Madrigal said he probably seen a screwdriver that large but that he did not think he had touched it.

Madrigal stated that he had seen the other males carry screwdrivers before, and he agreed that they were "known to carry screwdrivers at times." When asked if he knew specifically who was known to carry a screwdriver, Madrigal said, "I'd say like all of them. If they ain't got a screwdriver they got either uh, uh like a[n] ice pick or a knife." When asked why they would carry these items, Madrigal responded "To stab people, hurt people. I don't know. I know personally I just carry screwdrivers so you could carjack people. You know what I mean? Like stolen cars." When asked if he would carry something for protection, Madrigal said he would, but when asked about "gang banging," Madrigal said, "No, shit, I don't gang bang. I just sometimes I walk around with a knife now because uh, I'm like fuck, I don't want to be caught without one. It's uh, if, if I, these guys decide to jump me or something, I'm going to try to walk away, but if someone puts their hands on me then well, I got to defend myself."

### 4.  *Search and Interview of Pacheco*

On June 12, 2013, the police executed a search warrant at Pacheco's home and took her and her brother Torres into custody. The van used in the assault was parked in the driveway of her house. Pacheco admitted to the police that she had been driving the van at the time of the assault. She stated that after driving with Madrigal and Barrientos to the liquor store, she was driving away from the store when Madrigal said he "saw someone that he didn't like." Madrigal said he wanted to talk to this person and told Pacheco to park down the street. Pacheco said Madrigal got out of the van alone, after which he came back walking "fast paced", got in the van, and told Pacheco to drive home. The police then confronted Pacheco with the videos showing multiple persons walking on Southside Drive. Pacheco then admitted that Martinez, Torres, and Nieto were also in the van at the time. Pacheco said there was another female in the van, but Pacheco stated she did not know her name. Pacheco stated that after Madrigal said he

8

saw somebody he did not like, she parked, and all four of the males got out while the females stayed in the van. Madrigal was the first to jump out. Then the males all ran back to the van.

### 5. *Interview of Madrigal on June 17, 2013*

After searching and interviewing Pacheco, the police re-interviewed Madrigal on June 17, 2013. The police informed Madrigal, who was in custody, that they had found things in his house and that others were making accusations against him, so they wanted to hear his responses to them.

Madrigal then admitted that he was with the other males from the van to do a "beer run" but he claimed he did not know the victim was going to be stabbed or killed. He admitted that in his prior interviews, he had left out that "I was walking with them to do the beer run. And when the guy came, I actually kinda like held him like, but I didn't know like—like he got stabbed and I didn't know like the guy stabbed him. I didn't know a murder was gonna be involved. I'm like—like when they chased him, and got him, I just like grabbed him like just come here, where you going? And that's it. And I let him go. That's all I did."

Madrigal again asserted that the "the little kid," whose name Madrigal did not know, was the one who stabbed the victim. When asked to explain again how it happened, Madrigal said he and the four other males were walking together when "all those niggas got on him first." Madrigal continued, "[S]o I like . . . grab him like this and they're getting on him and then the next thing you know, this nigga fucking falls and—and then all I heard is, 'Ah, why you guys doing this? Man, why?' And I'm like, 'Fuck.' " Then they ran back to the van.

The police asked Madrigal if he punched the victim. Madrigal asserted he did not punch the victim, but when asked why he held the victim, Madrigal explained, "I was gonna whoop his ass, like I was gonna help them but then like, like I just held him and

9

like, I didn't hit nobody. I'm like—I like threw him down, like I just threw him down for them. That's when I backed up. I didn't punch nobody."

Madrigal said he did not see anyone stab the victim. He said that when "I seen the kid," that was "when I let go. Like oh, shit." Madrigal said Torres had a screwdriver at the scene, but that Torres did not stab the victim with it. Torres was "more or less just hitting the dude." Barrientos and Martinez were also hitting the victim.

When asked again why they attacked Harvey, Madrigal responded that "everybody was buzzing" and he described their attitude as, "Anything goes like fuck it, we're just gonna, we're just gonna fucking cause a ruckus. These guys wanted to cause a ruckus and I knew better. I knew I shouldn't have jumped out of that car, man." The police asked Madrigal who took Harvey's money, and Madrigal said it was "the kid who poked him because he was passing it out." Madrigal asked them "What'd you guys get?" and the stabber responded, "30 something lousy dollars." The police asked if they intended to rob the victim "in the first place," or at what point did the robbery come up. Madrigal said, "After we already left and then like—he told us how much money he got. That's the only involvement I had in it, sir."

The police again asked if the plan was really to do a beer run, and Madrigal responded again that he was really planning to buy beer, because he had money on him. When the police asked Madrigal whether he got out of the van to do a beer run or "to cause a ruckus," Madrigal again stated he was just planning to buy beer. The others were planning to do a "beer run" because they did not have money, and he did not want to pay for their beer again, having already bought beer for them earlier in the day. When the police asked Madrigal if he heard anything like one of them "made some plans about some things to get money," Madrigal responded in the negative.

The police again asked Madrigal whether he heard the others talk about getting money and "insinuating a robbery." Madrigal said "there was small talk in the back of the van about that and I was like we ain't bothering nobody, man. Nobody's getting

10

fucking robbed." When the police asked who was talking about robbery, Madrigal responded, "Um, they weren't talking about robbery. Uh, they were like, 'Man, fuck it. Let's just—let's just get a Paisa; whoa, whoa, whoa.' And I was like, 'Dude, nobody's gonna fucking do—you guys gonna fucking do a beer run, then well, let's go fucking do it. That's it, man.' That's it. That's all. That's it, man. Nobody has to fucking rob nobody. And I said it. I said nobody has to rob nobody and—and they were gonna do the beer run already. So I was just like let's just do the fucking beer run, man."

The police asked Madrigal, "What did you think when they stopped this guy?" Madrigal stated that "they ran up on them," and he thought they would "just whoop his ass." Nobody talked to the victim.

Madrigal stated he did not have any weapons on him at the time. He said that after they got back to the house, Torres stated he was hitting the victim when he (Torres) dropped the screwdriver, but Torres denied stabbing the victim. Madrigal said that after the victim was stabbed, "that's why I backed up like—like that's why I threw him. I threw him down and I was like fuck. Like in my eyes, and I was like, 'Why do you gotta stab him, blood?' "

Madrigal denied that he had blood on his hands or clothes, and he stated that he didn't stab the victim or do anything to get blood on his hands. He admitted he told the others to wash the blood off themselves and their clothes. He did not want to get caught, "For something I didn't like—something I didn't —I didn't know this guy was gonna fucking stab him or I didn't know all this." He denied he was "trying to be their leader or anything like that."

### 6. *Testimony of Alicia Pacheco*

Pacheco testified at trial for the prosecution. She testified in exchange for an agreement allowing her to plead guilty to charges of assault with a deadly weapon and accessory to murder with gang enhancements for a maximum term of 11 years in prison. She had been charged with murder, robbery, and a gang enhancement. She had been

11

romantically involved with Madrigal before the assault. Madrigal told her he was from the "SJG" gang, which Pacheco understood to mean "San Jose Grande," a Norteño gang.

Pacheco admitted to driving the van the night of the assault. She testified that Lobo (identified as Moises Hernandez) was not there. She had drawn a map for the police showing the route she took before and after the incident. She testified that after the group got into the van that night, they went to a liquor store on the corner of Southside Drive and Monterey Road. She went into the store by herself, bought a blunt wrap, and came back to the van.

She then drove the van out of the liquor store parking lot and turned left (northeast) onto Southside Drive. She continued driving on Southside Drive past Hope Street and toward the intersection of Southside Drive and Water Street, where there was a stop sign. She testified that Madrigal had seen someone on the sidewalk as she was driving by, and Madrigal said something to the effect that he didn't like the man, but she could not recall the exact words Madrigal used.

She stopped at the stop sign at the intersection of Southside Drive and Water Street, and Madrigal, Barrientos, Martinez, and Torres got out of the van. Jasmine Nieto and another girl, whose name Pacheco did not know, stayed in the van. After the males got out of the van, Madrigal told her to "[G]o back to that street." She made a U-turn at the intersection and drove back (southwest) down Southside Drive. She turned right (northwest) onto Hope Street, made another U-turn, and came back down Hope Street toward Southside Drive. She stopped the van on Hope Street before reaching Southside Drive and waited about 30 seconds or a minute until the males came back and got in the van.

Pacheco testified there was no talk of a "beer run" before the males got out of the van. She did not see the assault, and she did not hear whether they were talking about it, but Madrigal had blood on his hand. Later, they went to a Safeway, where Madrigal and

12

Barrientos got out. They came out with two cases of beer, and Barrientos was running. Barrientos was laughing in the back of the van afterwards.

Pacheco testified that later that night, Madrigal told her he had stabbed the man. She testified Madrigal threw her against the wall and choked her, telling her he "can't leave a witness." She did not see him with a weapon at any point.

On cross-examination, Pacheco admitted she blamed Madrigal for her being in custody, and that she had stated, " 'That piece of shit could fucking die, for all I care.' " She admitted having made several statements to the police that contradicted her testimony. She had previously told the police Madrigal had not been violent with her. She had also told police she did not know if Hernandez was with them at the time of the assault.

Pacheco testified she did not hear any discussion of a beer run in the van before the attack, but she conceded she had taken Torres and his friends for beer runs in her van on prior occasions. She would drive them to the store in her van, and they would come running out of the store with stolen beer.

A police officer subsequently testified to inaccuracies in Pacheco's pretrial statements to the police. Pacheco had told police that Madrigal was the only one who got out of the van before the attack. She changed her version of what happened after the police told her they knew she was lying and threatened to "send her to jail." She did not admit her brother was involved until the police told her they knew he was involved.

### 7. *Testimony of Jasmine Nieto*

Jasmine Nieto, Alicia Pacheco's cousin, testified that she was in the van that night. ~(20 RT 5723, 5734)~ She was 15 years old at the time. ~(20 RT 5722)~ Nieto testified that, among others, "Lobo" (Moises Hernandez) was in the van but Martinez was not. ~(20 RT 5738-5739)~

Nieto testified that after they parked at the liquor store, both she and Pacheco went inside to buy some snacks. They got back into the van, drove down the street, and

13

"dropped off all the guys" in front of the apartments next to the liquor store. She didn't hear the males say anything before they were dropped off. The girls waited in the van for "[m]aybe a couple minutes" and the males came back. They were running, and they were out of breath.

Nieto testified that the van was facing "in this direction" when they dropped off the males, but the record does not indicate which direction. The prosecutor questioned Nieto about a map she had drawn for the police showing the route the van had taken that night. The map shows a red "X" marking the location of the liquor store, with a red line coming out of the parking lot, continuing northeast down Southside Drive, turning southeast onto Water Street, and continuing down Water Street.

On cross-examination, Nieto testified that after they dropped off the males, she and Pacheco just drove around for an hour, whereupon they returned to pick up the males at the same place where they had been dropped off. Nieto did not remember them saying anything when they got back. She remembered a "beer run" happening that night, but she couldn't remember when or where it happened. She saw blood on Torres's shoe, but she did not remember seeing blood on anyone else. She did not learn there had been a robbery or killing that night until the police came to her house.

Nieto told the police that Torres thought Madrigal was cool, and that Torres was a "follower" of Madrigal. She did not have any memory of anyone talking about doing a "beer run" that night.

### B. Procedural Background

The prosecution charged Madrigal with three counts: count 1—murder (Pen. Code, § 187)[2]; count 2—second degree robbery (§§ 211, 212.5, subd. (c)); and count 3—active participation in a criminal street gang (§ 186.22, subd. (a)). As to counts 1 and 2, the information alleged Madrigal committed the offenses for the benefit of, at the

---

[2] Subsequent undesignated statutory references are to the Penal Code.

14

direction of, or in association with a criminal street gang. (§ 186.22, subd. (b)(1).) The information further alleged Madrigal had suffered two prior strike convictions and had served two prior prison terms. (§§ 667, subds. (a)-(i), 667.5, subds. (b)-(c), 1170.12.) The case proceeded to trial in February 2018.

The court instructed the jury on three theories of first degree murder based on CALCRIM No. 521: willful, deliberate, and premeditated murder; murder by lying in wait; and felony murder. For the felony murder theory, the court instructed the jury based on CALCRIM No. 540B with robbery or aiding and abetting robbery as the underlying felony.

In closing argument, the prosecutor argued the evidence supported all three theories of first degree murder. He argued the felony murder theory first, and he suggested the jury should also start with that theory first because the law was simpler and would require less time in deliberations. He conceded there was no reliable evidence of who stabbed Harvey, and he told the jury he was not trying to prove Madrigal was the stabber. While the prosecutor argued "this was an implied malice murder case, without a doubt," he also argued the evidence showed the killing was premeditated, willful, and deliberated. He further argued the evidence proved lying in wait, and that lying in wait could be proved on an implied malice theory because it did not require intent to kill.

In deliberations, the jury asked multiple questions, including whether they could convict Madrigal of robbery as a natural and probable consequence of assault with force likely to produce great bodily injury. The trial court answered affirmatively and gave the jury additional instructions on this theory of liability. The court further instructed the jury that if it found Madrigal guilty of robbery based on a theory of natural and probable consequences, the robbery could not be used as a basis for felony murder.

The jury found Madrigal guilty of first degree murder (count 1) and second degree robbery (count 2) but acquitted him of participation in a criminal street gang (count 3)

15

and found the gang allegations not true.  The trial court found true the prior conviction and prison term allegations.

The trial court imposed an aggregate term of 100 years to life consecutive to 12 years in state prison.  The term consisted of 75 years to life for count 1, 25 years to life for count 2, two consecutive five-year terms for each prior conviction, and two consecutive one-year terms for each prior prison term.

## II. DISCUSSION

### A. Effect of Amendments to the Felony Murder Statute on the First Degree Murder Conviction

Madrigal contends we must vacate his first degree murder conviction based on the application of Senate Bill No. 1437 (2017–2018 Reg. Sess.) (Senate Bill 1437), which amended the definition of felony murder to add the elements now set forth in subdivision (e) of section 189.  The Attorney General concedes the amended version of the statute applies to this case but he contends the failure to instruct the jury on the newly added elements of felony murder was harmless beyond a reasonable doubt given the evidence in the record.  Madrigal disputes that the error was harmless.

### 1. Legislative Amendments Enacted Under Senate Bill Nos. 1437 and 775

"Senate Bill 1437 'amend[ed] the felony murder rule and the natural and probable consequences doctrine, as it relates to murder, to ensure that murder liability is not imposed on a person who is not the actual killer, did not act with the intent to kill, or was not a major participant in the underlying felony who acted with reckless indifference to human life.' (Stats. 2018, ch. 1015, § l, subd. (f).)" (*People v. Gentile* (2020) 10 Cal.5th 830, 842.)  The relevant amendment is set forth in subdivision (e) of section 189:  "A participant in the perpetration or attempted perpetration of a felony listed in subdivision (a) in which a death occurs is liable for murder only if one of the following is proven:  [¶] (1) The person was the actual killer.  [¶]  (2) The person was not the actual killer, but, with the intent to kill, aided, abetted, counseled, commanded, induced, solicited,

requested, or assisted the actual killer in the commission of murder in the first degree. [¶] (3) The person was a major participant in the underlying felony and acted with reckless indifference to human life, as described in subdivision (d) of Section 190.2." (§ 189, subd. (e).) The specific part of the amendment at issue here is the addition of subdivision (e)(3) of section 189, which incorporates the existing felony-murder special circumstance set forth in subdivision (d) of section 190.2.

"Senate Bill 775 amended [section 1172.6] to provide that a person with a qualifying conviction that is *not final* may challenge the validity of that conviction on direct appeal based on Senate Bill 1437's changes to the murder statutes."[3] (*People v. Birdsall* (2022) 77 Cal.App.5th 859, 865-866 (*Birdsall*).) "A person convicted of murder, attempted murder, or manslaughter whose conviction is not final may challenge on direct appeal the validity of that conviction based on the changes made to Sections 188 and 189 by Senate Bill 1437 (Chapter 1015 of the Statutes of 2018)." (§ 1172.6, subd. (g).)

The amended section 189 sets forth two elements in subdivision (e)(3): whether the defendant was a "major participant" in the underlying felony, and whether the defendant acted with "reckless indifference to human life." (§ 189, subd. (e)(3).) These elements reflect the language used by the United States Supreme Court in *Tison v. Arizona* (1987) 481 U.S. 137, and California courts have looked to that case in construing the terms. (*People v. Banks* (2015) 61 Cal.4th 788, 798 (*Banks*).)

The "major participant" element refers to "the defendant's *personal* role in the crimes leading to the victim's death" and is intended to reflect "the defendant's individual responsibility for the loss of life, *not just his or her vicarious responsibility for the underlying crime.*" (*Banks*, *supra*, 61 Cal.4th at p. 801, italics added.) In other words, the focus is on the defendant's own culpability, not on the others who committed

---

[3] Effective June 30, 2022, the Legislature renumbered section 1170.95 as section 1172.6 with no change in the text. (Stats. 2022, ch. 58, § 10.)

the crime and killed the victim. (*Ibid.*) "[A] defendant's personal involvement must be substantial, greater than the actions of an ordinary aider and abettor to an ordinary felony murder." (*Id.* at p. 802.)

"Reckless indifference to human life is 'implicit in knowingly engaging in criminal activities known to carry a grave risk of death.' [Citation.] Examples include 'the person who tortures another not caring whether the victim lives or dies, or the robber who shoots someone in the course of the robbery, utterly indifferent to the fact that the desire to rob may have the unintended consequence of killing the victim as well as taking the victim's property.' [Citation.] Reckless indifference 'encompasses a willingness to kill (or to assist another in killing) to achieve a distinct aim, even if the defendant does not specifically desire that death as the outcome of his actions.' [Citation]." (*In re Scoggins* (2020) 9 Cal.5th 667, 676-677 (*Scoggins*).)

"Reckless indifference to human life has a subjective and an objective element. [Citation.] As to the subjective element, '[t]he defendant must be aware of and willingly involved in the violent manner in which the particular offense is committed,' and he or she must consciously disregard 'the significant risk of death his or her actions create.' [Citations.] As to the objective element, ' "[t]he risk [of death] must be of such a nature and degree that, considering the nature and purpose of the actor's conduct and the circumstances known to him [or her], its disregard involves a gross deviation from the standard of conduct that a law-abiding person would observe in the actor's situation." ' [Citation.] 'Awareness of no more than the foreseeable risk of death inherent in any [violent felony] is insufficient' to establish reckless indifference to human life; 'only knowingly creating a "grave risk of death" ' satisfies the statutory requirement. [Citation.] Notably, 'the fact a participant [or planner of] an armed robbery could anticipate lethal force might be used' is not sufficient to establish reckless indifference to human life. [Citations.]" (*Scoggins*, *supra*, 9 Cal.5th at p. 677.)

The legal meanings of these elements incorporate the existing felony-murder special circumstances defined in subdivision (d) of section 190.2.  As such, case law preceding the enactment of Senate Bill 1437 established an overlapping set of factors relevant to a showing of the two elements.  CALCRIM No. 540B sets forth a pattern jury instruction with a nonexclusive list of the factors.

## 2. *Application of the Statutory Amendments to the First Degree Murder Conviction*

Madrigal contends the enactment of Senate Bill 775, which took effect after he filed this appeal, allows him to challenge his murder conviction based on the statutory amendments made by Senate Bill 1437.  The Attorney General does not dispute this.  The plain language of section 1172.6, subdivision (g) gives defendants the right to challenge a murder conviction on direct appeal so long as the conviction is not final; it places no other time limits on that right.  Madrigal's conviction is not yet final, so he may bring that challenge here.  (*Birdsall*, *supra*, 77 Cal.App.5th at p. 866; *People v. Hola* (2022) 77 Cal.App.5th 362, 369-370 (*Hola*).)

The Attorney General also does not dispute that under the amendments Senate Bill 1437 made to the definition of felony murder in section 189, the jury instructions on felony murder at Madrigal's trial were erroneous.  Because the trial predated the enactment of Senate Bill 1437, the instructions did not include any of the additional elements set forth in subdivision (e) of the amended section 189.  Although the court correctly instructed the jury based on the law in effect at the time, a postconviction change in the law upon which the conviction is based is still treated as instructional "error" as if the erroneous instruction was given at the time of trial.  (*Hola*, *supra*, 77 Cal.App.5th at p. 371; *Birdsall*, *supra*, 77 Cal.App.5th at p. 868.)

While the parties agree that instructing the jury on first degree felony murder without the newly added elements constitutes instructional error, they disagree on whether the error requires reversal.

19

### a. *Relevant Procedural Background*

The trial court instructed the jury on three theories of liability for first degree murder: willful, deliberate, and premeditated murder; murder by lying in wait; and felony murder where the death was caused in the commission of a robbery. In closing argument, the prosecutor raised the felony murder theory of liability first, together with the elements of robbery, and he presented the evidence supporting them. Consistent with the jury instructions, the prosecutor argued the jury could find Madrigal guilty of felony murder even if the killing was unintentional, accidental, or negligent.

The prosecutor then discussed the elements of murder more generally. He expressly conceded that the evidence did not establish the identity of the person or persons who stabbed Harvey: "There is no reliable evidence in this case about the identity of the stabber or stabbers— right? —including Joel Madrigal himself. . . . [¶] . . . So I'm just trying to be very clear here that I am not presenting a case to you and asking you to find Joel Madrigal [*sic*] because there is reliable evidence of who the stabber is. I'm going to explain why you should find him guilty even though there isn't any reliable evidence of who the stabber is. [¶] And let me be clear. By that I mean I don't think you can find, beyond a reasonable doubt, he was the stabber. All right? I don't think you can do that. And I'm not asking you to premise any verdict on him on that belief. Because there's no witness to that, and he didn't confess. And I don't think you can just say, 'Well, because he lied, he had to be the stabber.' That's not proof beyond a reasonable doubt."

In discussing the mens rea for murder, the prosecutor emphasized implied malice and the theory of natural and probable consequences: "So this is an implied malice murder case, without a doubt. You don't have to figure out who the stabber was, because this was a group attack, with weapons. . . . [¶] . . . Holding a person while your fellow gang members are attacking him with weapons is an act that the direct and natural and

20

probable consequence of doing that is a person is going to die if you hold them doing—doing that."

Later in his argument, the prosecutor raised the other two theories of first degree murder, but he urged the jury to consider the felony murder theory first, and he summarized it as follows: "I would suggest, actually, as a group, deliberating on felony murder first for this reason: It's—the law is simpler. [¶] If there was a robbery, and Joel Madrigal knew about it and participated in it, and somebody was killed in the course of the robbery, even accidentally, that's felony murder. You don't have to go into implied malice. You don't have to look at the acts, whether . . . the death was a natural and probable consequence of his act. It's just was there a robbery, and did someone die? Donald Harvey died. [¶] So, really, felony murder just comes down to was there a robbery; did Joel Madrigal know about it?" He emphasized again that felony murder was the easiest theory to apply because, "That means you don't have to spend time deliberating on the law in murder, those two elements, nor do you have to spend any time going through was it willful, deliberate, and premeditated, or was it lying in wait." He then presented evidence for the other two theories of first degree murder.

In the final version of the instructions, the trial court again instructed the jury on three different theories of liability for first degree murder: willful, deliberate, and premeditated murder; murder by lying in wait; and felony murder. As to first degree felony murder, the trial court instructed the jury it could only find Madrigal guilty of felony murder if he intentionally committed a robbery or intentionally aided and abetted a robbery by another person who did the act that resulted in death during the commission of the robbery.

On count 1, the jury rendered a general verdict finding Madrigal guilty of murder in the first degree without specifying any additional facts or any theory of liability, but the jury found the gang allegation not true. Similarly, as to count 2, the jury found

21

Madrigal guilty of robbery in the second degree but found the gang allegation not true. On count 3, the jury found Madrigal not guilty of participating in a criminal street gang.

### b. The Standard for Evaluating Harmless Error

As set forth above, the trial court instructed the jury on three possible theories of liability for first degree murder: willful, deliberate, and premeditated murder; murder by lying in wait; and felony murder. The first two theories each provided a valid alternative theory the jury could have used to convict Madrigal, but the version of the felony murder theory presented to the jury was invalid.

At oral argument, the Attorney General conceded there is a reasonable probability the jury relied on the invalid felony murder theory. The concession is well-taken. The prosecutor emphasized the felony murder theory in closing argument, and the evidence for the other theories—that the murder was willful, deliberate, and premeditated, or that it was committed by lying in wait—was far from overwhelming. The evidence for the invalid felony murder theory was much stronger, and the jury actually convicted Madrigal on the underlying felony. The jury in deliberations did submit multiple questions about lying in wait, but we cannot conclude from this alone that the jury relied on that theory beyond a reasonable doubt; nor does the Attorney General argue this. The Attorney General further concedes there was substantial evidence that Madrigal was neither the actual killer nor an aider and abettor who intended to kill. The Attorney General's harmless error argument relies solely on subdivision (e)(3) of section 189, allowing for felony murder liability if the defendant was a major participant in the underlying felony and acted with reckless indifference to human life.

Because the trial court did not instruct the jury on all the elements of first degree felony murder under the amended version of section 189, the error violated Madrigal's right to a jury trial on all the elements of the offense under the federal Constitution. To evaluate prejudice from a federal constitutional error, we apply the *Chapman* standard, "requiring the beneficiary of a constitutional error to prove beyond a reasonable doubt

that the error complained of did not contribute to the verdict obtained." (*Chapman v. California* (1967) 386 U.S. 18, 24 (*Chapman*).) "Instructional error regarding the elements of the offense requires reversal of the judgment unless the reviewing court concludes beyond a reasonable doubt that the error did not contribute to the verdict." (*People v. Chun* (2009) 45 Cal.4th 1172, 1201.) The state has the burden to show the error was harmless. (*Arizona v. Fulminante* (1991) 499 U.S. 279, 296.)

In his briefing, Madrigal argued the proper standard for prejudice is whether the record shows beyond a reasonable doubt that the jury actually relied on a valid theory of liability. At oral argument, however, both parties conceded the proper standard is set forth in the California Supreme Court's recently filed opinions, *In re Lopez* (2023) 14 Cal.5th 562 (*Lopez*) and *In re Ferrell* (2023) 14 Cal.5th 593 (*Ferrell*).[4] Whether the error is characterized as instruction based on an invalid theory or the omission of required elements, "a reviewing court may hold the error harmless where it would be impossible, based on the evidence, for a jury to make the findings reflected in its verdict without also making the findings that would support a valid theory of liability." (*Lopez*, at p. 568.)

"[W]hile 'overwhelming' evidence may demonstrate harmlessness, a court's analysis of whether the evidence is 'overwhelming' in this context is not as subjective or free-ranging as that term might imply. Instead, the analysis requires a court to rigorously review the evidence to determine whether any rational juror who found the defendant guilty based on an invalid theory, and made the factual findings reflected in the jury's verdict, would necessarily have found the defendant guilty based on a valid theory as well. [Citation.]" (*Lopez, supra*, 14 Cal.5th at p. 568.) "The question here is not the

---

[4] Madrigal further contends harmless error analysis based on the evidence in the record is inapplicable in this case because he lacked notice of the newly added elements at the time of trial, such that defense counsel had no reason to adduce or argue the evidence relevant to them. Madrigal's argument relies largely on facts not in the record—e.g., his trial counsel's strategic decisions about what investigation to conduct— and would be more appropriately raised in writ proceedings. In any event, because we find the error requires reversal for the reasons below, we do not address this issue.

sufficiency of the evidence to support a valid theory, but its opposite." (*Id*. at p. 591.)  To determine harmlessness, "a reviewing court essentially asks whether any rational juror who made the findings reflected in the verdict and heard the evidence at trial could have had reasonable doubt regarding the findings necessary to convict the defendant on a valid theory." (*Ibid.*)

*Lopez* relied on the harmless error standard for the failure to instruct on an element of the offense as set forth in *Neder v. United States* (1999) 527 U.S. 1 (*Neder*).  A reviewing court does not reweigh the strength of each party's evidence; it does not " 'become in effect a second jury to determine whether the defendant is guilty.' [Citation.]" (*Id.* at p. 19.)  Even when the prosecution's case is strong, the error is not harmless if the record contains evidence that could rationally lead to a contrary finding.  (*Ibid*.)  We do not focus exclusively on the evidence favorable to the verdict, and we do not presume the existence of any facts the jury might reasonably infer in favor of the prosecution.  (*People v. Mil* (2012) 53 Cal.4th 400, 418 (*Mil*).)  We do not view the evidence in the light most favorable to the prosecution.  We review the evidence in the light most favorable to the defendant, and in doing so, we do not reweigh the evidence or resolve evidentiary conflicts.  (*Ibid.*; *People v. Valenti* (2016) 243 Cal.App.4th 1140, 1166-1167 (*Valenti*).)  "The testimony of a single witness may be sufficient—even if there is significant countervailing evidence, and the testimony is subject to justifiable suspicion." (*Valenti*, at p. 1167 [citing *People v. Barnwell* (2007) 41 Cal.4th 1038, 1052].)  If a thorough review of the record shows there is any evidence that a rational juror could find as a basis for reasonable doubt as to any erroneously omitted element, then the error requires reversal, even when there is "ample evidence" to support a finding of guilt.  (See *Valenti*, at p. 1166.)

### c. *The Error Was Not Harmless*

We first observe that nothing in the jury's verdicts or findings, viewed in isolation, implies the jury found either of the two omitted elements.  The jury rendered a general

verdict of guilt on the first degree murder charge, in addition to the verdict on second degree robbery. The jury found the gang enhancements not true and acquitted Madrigal on the substantive gang count. The jury found Madrigal guilty on the robbery count, but this does not necessarily imply a finding that he was a major participant in it or that he acted with reckless indifference to life. None of the findings show the jury did not rely on the erroneous felony murder instructions, and nothing else in the verdicts implies the jury found the omitted elements.

Looking to the evidence in the record, the Attorney General contends the evidence overwhelmingly shows Madrigal was a major participant in the robbery and acted with reckless indifference to life. Madrigal contends the record shows these elements were not established beyond a reasonable doubt by the evidence pertaining to his state of mind and conduct during the offense.

The Attorney General relies on *Mil, supra,* 53 Cal.4th 400, and *Birdsall, supra*, 77 Cal.App.5th 859, to support his position. But in both *Mil* and *Birdsall*, the reviewing courts based their conclusions in part on whether the omitted elements were uncontested. This is in accord with the harmless error standard first set forth in *Neder*: The error is harmless "where a reviewing court concludes beyond a reasonable doubt that the omitted element was *uncontested* and supported by overwhelming evidence." (*Neder*, *supra*, 527 U.S. at p. 17, italics added; *People v. Merritt* (2017) 2 Cal.5th 819, 832 (*Merritt*); *Birdsall*, at p. 867.)

In *Mil*, *supra*, 53 Cal.4th 400, the California Supreme Court considered a trial court's failure to instruct the jury on the major participant and reckless indifference elements of the felony-murder special circumstance under subdivision (d) of section 190.2. Because those are the same as the elements omitted from the felony-murder instructions at issue in this case, the Attorney General argues *Mil* is on point. We agree that *Mil* is on point, but it does not support the Attorney General's position that the error here was harmless. The Court in *Mil* concluded the error was not harmless and reversed

the true finding on the special circumstance because the element of intent was not uncontested and the evidence could have supported a finding of reasonable doubt. (*Mil*, at pp. 417-419.) As in *Mil*, here the element of intent was not uncontested. While the element of reckless indifference to human life was not specifically litigated here, Madrigal made numerous statements and defense counsel made numerous arguments about his state of mind that cannot be reconciled with a finding of reckless indifference.

In *Birdsall*, *supra*, 77 Cal.App.5th 859, the Court of Appeal for the First District, Division 4, considered the effect of Senate Bill 1437's amendment to the felony murder statute, similar to the claim brought here. *Birdsall* is somewhat less on point than *Mil*, in that *Birdsall* did not concern the elements added by subdivision (e)(3) of section 189; it instead relied on subdivision (e)(1), holding that the record showed Birdsall was the "actual killer." *Birdsall* is instructive, however, in its application of the harmless error standard under *Neder*. As in this case, the trial court instructed the jury on a theory of first degree felony murder as well as premeditated murder. The defendant was convicted of first degree murder, and the jury found true three special circumstances—that the murder was committed by means of lying in wait, committed during a robbery, and committed during and a burglary. (§ 190.2, subds. (a)(15), (a)(17)(A) & (a)(17)(G).) While the matter was on appeal, the Legislature enacted Senate Bill 1437, and Birdsall argued the trial court's felony murder instructions were defective because they omitted the additional elements now in subdivision (e) of section 189. (*Birdsall*, at p. 867.)

Applying the harmless error standard for omitted elements as set forth in *Merritt*, *supra*, 2 Cal.5th 819, the Court of Appeal found the error harmless. (*Birdsall*, *supra*, 77 Cal.App.5th at p. 870.) In his confession, Birdsall had described in detail how he and his friend strangled the victim with chokeholds and wrapped a rope around her neck, with Birdsall and the friend each pulling on the two ends of the rope until the victim stopped breathing. (*Id.* at p. 862.) In closing argument, defense counsel for Birdsall did not contest that he killed the victim, and argued instead that he was in a dissociated state at

the time. (*Id.* at p. 871.) On these grounds, the Court of Appeal held it was uncontested that Birdsall personally killed the victim, and that no rational jury could find he was not the actual killer. Accordingly, the Court of Appeal held the error was harmless beyond a reasonable doubt because a finding that the defendant is the actual killer is one of the additional grounds for felony-murder liability under the amended version of section 189. (§ 189, subd. (e)(1).) As to all the remaining elements required for felony murder, the trial court had properly instructed the jury. (*Birdsall,* at p. 872.)

Unlike in *Birdsall*, in this case, Madrigal's statements and his counsel's arguments both contested his state of mind and the extent of his participation in the robbery. First, Madrigal made numerous statements to the police contradicting the state of mind required for reckless indifference to life. To establish reckless indifference, the prosecution would be required to show, among other things, that Madrigal was aware of and willingly involved in the violent manner in which the robbery was committed, and that he consciously disregarded the significant risk of death his actions created. (*Scoggins*, *supra*, 9 Cal.5th at p. 677.) In multiple interviews, the police questioned Madrigal repeatedly about what he knew or heard prior to the assault, and he repeatedly asserted that he believed the group of males was on a "beer run"—taking beer from a store without paying—prior to encountering Harvey on the street. Madrigal told police he had his own money to buy beer for himself, and that he was not aware the others intended to rob Harvey prior to the attack. He admitted that he was involved in the attack by grabbing or holding the victim at some point, but he stated he was unaware Harvey had been stabbed until after the fact, and he claimed to express shock when it happened.

In closing argument, defense counsel asserted those statements were credible, and she contended the evidence objectively corroborated them. She argued that Madrigal had consistently told police the plan was to do a beer run, that there was no plan to commit a robbery, and no plan to commit a murder. She then highlighted the ways in which the evidence objectively corroborated Madrigal's version of events and his assertions that he

27

was unaware of any intent or plan to rob or stab the victim. Counsel argued there was "[n]o evidence whatsoever that he had any notion that anybody was going to pull out a knife and stab somebody." She argued that Madrigal knew only that it was an assault with fists, and there was nothing about an assault with fists that would be dangerous to human life. She argued there was no evidence he knew his actions were dangerous to human life or that he deliberately acted with conscious disregard for human life.

These portions of the record establish that, unlike in *Birdsall*, Madrigal contested his state of mind with evidence and arguments that squarely contradict the findings a jury would have to make to convict him of felony murder as a major participant in the robbery acting with reckless indifference to life under subdivision (e)(3) of section 189.

The Attorney General argues the evidence in the record proves the omitted elements of reckless indifference to human life and major participation beyond a reasonable doubt based on the various factors set forth in CALCRIM No. 540B. These factors include but are not limited to: whether Madrigal used a lethal weapon or knew lethal weapons would be present during the robbery; whether he knew lethal weapons were likely to be used; whether he knew they were used; whether he knew the number of weapons involved; whether he was near the victim when the killing occurred; whether he had the opportunity to stop the killing or help the victim; how long the crime lasted; whether he was aware of anything that would make a coparticipant likely to kill; and whether he tried to minimize the possibility of violence. Additional factors relevant to whether Madrigal was a major participant in the underlying offense include his role in planning the offense; his role in supplying or using lethal weapons; what he knew about dangers posed by the crime, any weapons used, or past experience or conduct of the other participants; whether he was in a position to facilitate or prevent the death; whether his actions or inaction played a role in the death; and what he did after lethal force was used. (*Scoggins*, *supra*, 9 Cal.5th at p. 677; *Banks*, *supra*, 61 Cal.4th at p. 803; *People v. Clark* (2016) 63 Cal.4th 522, 618-623 (*Clark*); CALCRIM No. 540B.) "No one of these

28

considerations is necessary, nor is any one of them necessarily sufficient. All may be weighed in determining the ultimate question, whether the defendant's participation 'in criminal activities known to carry a grave risk of death' [citation] was sufficiently significant to be considered 'major' [citations]." (*Banks*, at p. 803.) We consider the totality of the circumstances in analyzing reckless indifference to human life. (*Scoggins*, at p. 677.)

The first factor is whether the defendant used lethal weapons or knew lethal weapons would be used during the felony. (*Scoggins*, *supra*, 9 Cal.5th at p. 677.) The Attorney General does not point to any evidence that Madrigal used or possessed any weapons during the offense. Madrigal denied he had any weapons on him, and the prosecution presented no evidence to the contrary. There was no evidence Madrigal supplied any weapons involved in the robbery either.

The Attorney General asserts Madrigal knew the other attackers were in possession of lethal weapons based on his statements to police. The Attorney General further claims Madrigal "saw his cohorts carrying the specific weapons used in this case moments before the robbery murder." But the evidence is susceptible to the opposite conclusion as well. When the police asked Madrigal, "[D]id you ever see them carry screwdrivers before," he said that he had, and he agreed with the detective's statement that "these guys were known to carry screwdrivers." Madrigal added that they might also carry "a[n] ice pick or a knife." From this evidence a reasonable juror could infer that Madrigal was aware the other attackers could be carrying screwdrivers, knives, or other weapons, and he knew they had carried them before. But while a rational juror could infer that Madrigal was aware of a risk they might also carry weapons on this occasion, they could also entertain a reasonable doubt that he actually knew they had screwdrivers or a knife prior to the robbery at issue here.

Some of Madrigal's statements support a finding he saw a screwdriver *at the scene* of the robbery, but not that he was aware of it *before* the robbery. When the detective

asked Madrigal who had the screwdriver that was found at the scene of the robbery, Madrigal responded, "Boogie" (meaning Torres). The detective then asked, "Did you see him with that *at the scene*?" (Italics added.) Madrigal began to respond, "Yeah, like he . . . ," whereupon the detective interrupted him and added, "Or did you only hear about it at—at the end?" Madrigal responded, "No, no, he had it." The detective never asked Madrigal whether he saw the screwdriver before the robbery began, and the Attorney General does not point to any other evidence showing Madrigal was aware prior to the robbery that anyone had a screwdriver. Furthermore, there was no evidence Harvey was stabbed with a screwdriver. Madrigal told police Torres used his fists to hit Harvey, and at one point Madrigal said Torres had the screwdriver in his hand at the time, but Madrigal stated Torres did not stab Harvey with the screwdriver. This statement was corroborated by the prosecution's forensic pathologist, who testified it was not possible that the screwdriver found at the scene caused any of the five stab wounds found on Harvey.

The forensic evidence showed Harvey was killed with a knife, consistent with Madrigal's statement to police that he saw the stabber in possession of a knife after the robbery.[5] In support of the argument that Madrigal knew the other attackers possessed weapons, the Attorney General points out that Madrigal "was able to describe it in vivid detail," and the Attorney General quotes at length from Madrigal's statements describing it. But the quotes in the Attorney General's brief are statements by Madrigal describing what he saw *after* the robbery, when the stabber bragged about using the knife on Harvey. Madrigal told police the stabber was "just smiling, like laughing" when they got back to the van after the robbery, and added, "like we didn't know nobody got stabbed until we fuckin' got back to the fuckin'—to the fuckin' house and that's when fuckin'—he's like, 'Yeah, I fed his ass fuckin' three times nice and slow.' " The detective then

---

[5] No knives were admitted into evidence, but the forensic pathologist opined it was likely that four of the wounds, including the fatal wound, were caused by the same knife.

30

asked, "Did he have a knife on him?" Madrigal responded, "Yeah. They had the knife. They kept it. It was like a Rambo knife." Madrigal then described the physical appearance of the knife. Later, the detective asked Madrigal, "[D]id he have the knife on him at all during the night?" Madrigal responded, "Yeah," and stated it was in a black case. The detective again asked Madrigal, "Like it was like on him?" Madrigal then responded that "after like the stabbing" someone else took the knife from the stabber to clean it. Based on Madrigal's statements, a rational juror could entertain a reasonable doubt that Madrigal was aware prior to the robbery that anyone had a knife or any other lethal weapon.

Madrigal's statements support the inference that he knew after the fact that a knife was used to stab Harvey, and he saw Torres had a screwdriver in his hand while hitting Harvey. While it is possible for a screwdriver to be used as a lethal weapon, there is no evidence the screwdriver in this case was used in a lethal fashion. As to whether Madrigal knew the number of weapons involved, the evidence did not clearly establish how many weapons were used. The forensic pathologist opined that one of the stab wounds was different than the others, such that it was possible another knife was used, but there was no other evidence to establish the use of more than one knife.

We agree with the Attorney General that Madrigal's statements (if believed) could prove to a rational jury that he knew the other participants had a capacity for violence. He believed they were "associated with" and "cliqued up with" a gang, and he stated they were known to carry weapons. But based on this record, a juror also could have a reasonable doubt that Madrigal was aware they were likely to kill anyone.[6] Madrigal

---

[6] Although the Attorney General describes the coparticipants in the robbery as Madrigal's "fellow gang members," the evidence supporting this characterization was weak. The prosecutor in closing argument described Madrigal as "gang dropout who was leading a double life" and holding himself out to be a member of the "San Jose Grande" or "SJG," a Norteño gang subset. There was no evidence the other participants were ever SJG members. The prosecution's theory was that Madrigal was acting as an active

repeatedly told police he thought the purpose of the trip was to conduct a "beer run," but he also stated the others "were acting stupid like. . . . where fuckin' anybody could get it." The detective asked if this meant "maybe steal some shit" and Madrigal responded, "Yeah. You know what I mean? I just thought—they do a lot of beer runs," adding that he had been the one to pay beer early in the evening. When the detective asked why they stopped Harvey, Madrigal responded, "They were just like, 'Anybody can get it. We wanted to test it.' You know, and I was like, 'What the fuck?' " The detective asked again what "get it" meant, and Madrigal responded, "I wouldn't fuckin' like beat up random people" but he would walk around and "talk shit" when he was in a gang. He added that he thought "they were just fuckin' being dumbass little fucks and—and one of them fuckin' just wasn't fuckin' satisfied with that."

In a subsequent interview, the detective asked Madrigal why they assaulted Harvey, and Madrigal responded that "everyone was buzzing" and "we were just like the motto was fucking fucking it. Anything goes like fuck it, we're just gonna, we're just gonna fucking cause a ruckus. These guys wanted to cause a ruckus and I knew better." Later, the detective again asked Madrigal if he heard any of the others talking about "getting money" and "insinuating a robbery," Madrigal responded that "there was small talk in the back of the van about that and I was like we ain't bothering nobody man. Nobody's getting fucking robbed." When the detective asked who was talking about robbery, Madrigal responded that "they weren't talking about robbery," but that "they were like, 'Man, fuck it. Let's just—let's just get a Paisa." The detective asked Madrigal again what he thought they were going to do when they approached Harvey, and Madrigal responded, "Like just whoop his ass, man." Madrigal again denied he had any intention of robbing anyone and claimed he was just planning to buy beer. Based on these statements a reasonable juror could infer that Madrigal was aware it was possible

participant of the Norteño gang during the attack on Harvey. In any event, the jury rejected the gang allegations.

32

they could assault or rob someone but also conclude that the statements do not clearly establish that he knew it was likely they would actually kill someone, or even that it was likely they would use a lethal degree of force.

As to Madrigal's participation in the offense, it is undisputed that the record establishes he was present, that he was close to Harvey during the robbery and the stabbing, and that he held Harvey during the attack. Some of Madrigal's statements show he was likely holding Harvey at the point when Harvey was stabbed. Madrigal first stated that when the others chased Harvey, "I just like grabbed him like just come here, where you going? And that's it. And I let him go. That's all I did." He then stated that he grabbed Harvey, "and they're getting on him and then the next thing you know, this nigga fucking falls . . . ."

Madrigal asserted he did not hit Harvey. But when asked why he held Harvey, "I was gonna whoop his ass, like I was gonna help them but then like, like I just held him and like, I didn't hit nobody. I'm like—I like threw him down, like I just threw him down for them. That's when I backed up. I didn't punch nobody." At another point in the interview, Madrigal made a statement during which he said, "And then I was like—I said—I said now I seen this guy stab him and like literally I seen—like I seen him go like that," (while making a forward motion with his hand), "and that's why I'm just like backed up like —like that's why I threw him. I threw him down and I was like fuck. Like in my eyes, and I was like, 'Why do you gotta stab him, blood?' "[7] Madrigal repeatedly asserted he was taken by surprise by the stabbing. Nonetheless, a rational jury would likely conclude his actions played a role in Harvey's death.

---

[7] At this point in the interview, Madrigal was describing a conversation he had with the other participants later in the night after the robbery. It is unclear whether, in the quoted statement, Madrigal was relating the content of that conversation or if he was describing the actual event as he recalled it.

33

There was no evidence Madrigal demanded or took any money or property off Harvey's person, but his own statements clearly show he was a participant in the robbery as well as the physical assault on Harvey by holding him during the attack. By his own description of the attack, he was likely holding Harvey at the point when Harvey was stabbed, although he disavowed any foreknowledge of the stabbing.

As to the duration of the robbery, it was brief. The Attorney General estimates the attack and robbery lasted about 39 seconds based on the video recordings. The portions of the videos showing the vehicle lights coming and going suggest that about two minutes elapsed between the time when the group got out of the van and the time when they returned to it. A rational juror could determine that the offense was not committed over a "prolonged period" that would have created a "greater window of opportunity for violence" such that it was more likely the offense would culminate in murder. (See *Scoggins*, *supra*, 9 Cal.5th at p. 680 [because a prolonged restraint of the victim provides a greater window of opportunity for violence possibly culminating in murder, it can indicate that the defendant exhibited reckless indifference to human life].)

A rational juror could also conclude there was no clear or credible evidence Madrigal engaged in any planning for the robbery. The Attorney General, echoing the prosecutor in closing, argues the movement and stopping of the van more than a block away from the liquor store shows the attack was planned in advance—that the group was stalking Harvey, not planning a beer run. Defense counsel argued that Pacheco simply wanted to avoid having her van identified with the beer run, as shown by her testimony that she had parked away from the front of the store in a prior beer run.[8] A rational juror could reasonably believe the prosecutor's inference was more plausible, but even assuming it was true, this does not establish Madrigal's *personal* intent as distinct from that of the other participants. Determining a defendant's culpability under the reckless

---

[8] Police told Pacheco that another liquor store owner had called in a report of a different beer run and the owner had provided police the license plate number on her van.

34

indifference theory is an "individualized inquiry" focused on the " 'character of the individual offender.' " (*Scoggins*, *supra*, 9 Cal.5th at p. 683.) The only evidence Madrigal personally directed the movement of the van with a plan to get Harvey came from Pacheco, who testified that Madrigal had seen someone on the sidewalk as she was driving by, whereupon Madrigal said something to the effect that he didn't like the man. Pacheco testified that when she got to a stop sign, Madrigal got out of the van with the others and told her to drive up to the next street. But as the Attorney General concedes, Pacheco's credibility was dubious. She had multiple motives to blame Madrigal while exculpating herself and her brother, and the record shows she lied about critical facts on multiple occasions in her testimony and statements to police. The prosecutor in closing argument characterized Pacheco as "a mess" and conceded there was "no reliable evidence in this case about the identity of the stabber" despite Pacheco's testimony that Madrigal had admitted stabbing Harvey. While a rational jury could reasonably credit Pacheco's testimony about Madrigal directing her to stop the van, at most this shows a minimal degree of planning bordering on impulse. And while it contradicts Madrigal's claim that he thought they were only conducting a beer run, a rational juror could conclude it does not show Madrigal was planning to rob Harvey instead of merely harassing him or possibly assaulting him with less-than-lethal force.

As to whether Madrigal had an opportunity to stop the killing or help the victim, the evidence on this factor was mixed. Madrigal was one of four five attackers, and at least one of the others possessed a lethal weapon while Madrigal was unarmed. Madrigal estimated Torres was about the same height or maybe a little taller than himself, and that he weighed about 150 pounds. He estimated Barrientos was five feet seven inches tall and weighed 110 pounds. He described Martinez as "their big homie," who was about five feet eight inches tall and about 170 pounds. He described the stabber as a "real skinny kid" who was about five feet eight inches tall and around 140 to 150 pounds.

35

The Attorney General contends Madrigal could have used his influence over the others to stop them because he was significantly older and they looked up to him as an "OG" or "original gangster." Madrigal was 27 years old at the time, Pacheco was 23, Martinez was 21, Torres was 17, and Barrientos was 17. Pacheco testified that her brother Torres looked up to Madrigal, and the prosecution's gang expert testified that younger gang members are expected to follow the lead of older members. When the detective interviewing Madrigal suggested the others looked up to him, Madrigal agreed but he denied he directed them in the attack. Madrigal claimed that in the van before the attack he tried to discourage the others from doing anything other than getting beer, but he did nothing to physically stop it and he admitted he willingly joined the assault on Harvey to "just whoop his ass." Thus a rational juror could infer that Madrigal could have helped the victim or tried to stop the killing and failed to do so.

Similarly, a rational juror could conclude that Madrigal's statements and conduct after the killing demonstrated a calloused state of mind and indifference towards the victim's plight. Madrigal ran away from the scene after Harvey was stabbed and did nothing to help him. Furthermore, he advised the others to keep their voices down, wash off the blood, and get rid of their bloody clothing.

In summary, the record contains strong evidence that Madrigal was aware his coparticipants might have weapons such as screwdrivers, but a rational juror could conclude the evidence does not establish beyond a reasonable doubt he knew prior to the attack that anyone *actually* had a lethal weapon like the knife used to kill Harvey. There is no evidence Madrigal had any weapons in his own possession, he did not supply any weapons used in the offense, and he never expressed any intent to use lethal force. His statements to police support a finding he knew his coparticipants might assault or rob someone prior to the attack, but a juror could conclude that these did not clearly establish he was aware anyone intended to use lethal force. He characterized the others' attitude as "off the hook," "anybody can get it," and wanting to "cause a ruckus" or "get a Paisa,"

36

but those statements were ambiguous insofar as they did not clearly imply an intent to kill as opposed to robbing or assaulting someone without lethal force. There is little or no evidence of planning by Madrigal, but the evidence shows he was a willing participant in the physical assault on Harvey, he assisted in the assault by holding Harvey, and he was willing to assault Harvey himself with his fists.

This evidence was sufficient for a rational jury to infer Madrigal did all this knowing there was a risk the attack could turn fatal. But a rational juror also could conclude that the evidence falls short of proving reckless indifference to life beyond a reasonable doubt. "Awareness of no more than the foreseeable risk of death inherent in any armed crime is insufficient; only knowingly creating a 'grave risk of death' satisfies the constitutional minimum. [Citation.]" (*Banks*, *supra*, 61 Cal.4th at p. 808.) " '[T]he fact a participant [or planner of] an armed robbery could anticipate lethal force might be used' is not sufficient to establish reckless indifference to human life. [Citation.]" (*Scoggins*, *supra*, 9 Cal.5th at p. 677.) Even assuming Madrigal knew prior to the attack that someone would use a knife, that alone would not be sufficient to prove reckless indifference. "The mere fact of a defendant's awareness that a gun will be used in the felony is not sufficient to establish reckless indifference to human life. [Citation.]" (*Clark, supra*, 63 Cal.4th at p. 618.)

Furthermore, if a jury did not reject Madrigal's claims that he thought the others were only going to beat Harvey when Madrigal grabbed him, and that Madrigal was unaware Harvey would be stabbed until the moment it happened, those statements would provide grounds for reasonable doubt. The Attorney General dismisses those statements as lies while simultaneously relying on many other statements by Madrigal, treating them as sincere admissions of his participation in the offense. As a reviewing court, we do not automatically reject a defendant's statements based solely on their exculpatory nature. (See *People v. Brown* (2023) 14 Cal.5th 453 [a rational jury could have credited defendant's statements expressing a lack of intent to kill].) The question is whether the

37

evidence as a whole showed Madrigal's statements concerning his lack of awareness were so unbelievable that no rational juror would credit them.

It is indisputable that Madrigal lied repeatedly on multiple occasions about the extent of his involvement in the attack, including much of the first interview in which he claimed he never left the van. But it is also indisputable that many of his statements were accurate. A rational juror could reasonably evaluate these statements the same way the prosecutor did in closing argument—crediting inculpatory admissions while dismissing exculpatory denials. But the evidence supporting that interpretation in determining the element of reckless indifference was not so overwhelming that a rational jury would necessarily adopt it. A rational juror could believe some exculpatory portions of Madrigal's statements regardless of the fact that he lied in some parts. "Jurors remained free to pick and choose those portions of evidence they found credible, ' "weaving a cloth of truth" ' from available materials. [Citation.]" (*Ferrell*, *supra*, 14 Cal.5th at p. 605.)

Given that Madrigal lied in some statements and told the truth in others, a rational juror might also have some uncertainty about whether he was telling the truth or lying in his exculpatory statements and look instead to other evidence of reckless indifference that could independently disprove or corroborate the statements. The other evidence the Attorney General identifies consists of the movement and locations of the van; Pacheco's testimony about what Madrigal said to her; the participants' status as alleged gang members; evidence that Madrigal exercised influence over them; and the duration of the offense. For the reasons set forth above, a rational jury considering the whole of this evidence could find reasonable doubt based on Madrigal's statements disavowing any knowledge or awareness that the group would use lethal force.

Given the totality of the evidence, a rational juror could have a reasonable doubt whether Madrigal was subjectively aware of a grave risk of death when he participated in the attack on Harvey. Furthermore, we cannot say it would be impossible, based on the evidence, for a jury to make the findings reflected in its verdicts without also making the

findings that would support a valid theory of liability. We conclude the failure to instruct the jury on the omitted elements was not harmless under the standard set forth in *Lopez*, *supra*, 14 Cal.5th 562, and *Ferrell*, *supra*, 14 Cal.5th 593. We must therefore reverse the first degree murder conviction.

### B. The Trial Court's Failure to Review or Release Discovery Sought by the Defense

In December 2017, Madrigal subpoenaed the county jail for Pacheco's jailhouse phone calls, and they were produced to the trial court. After looking at the disc containing the recorded calls, but without listening to any of the calls, the court refused to release them to the defense. Madrigal contends the trial court erred by refusing to review and disclose the recordings. The Attorney General contends the court properly refused to release them because Madrigal was engaged in an impermissible "fishing expedition" and failed to show good cause for their release.

#### 1. Procedural Background

On December 19, 2017, defense counsel served a subpoena duces tecum on the Santa Clara County Department of Correction seeking, among other things, recordings of in-custody phone calls made by Pacheco between March 4, 2015 and the date of the subpoena. Concurrent with the subpoena, counsel filed a motion for release of the documents supported by a sworn declaration setting forth the grounds on which the defense was entitled to receive the documents.

Among other things, defense counsel's declaration asserted the following: Pacheco had previously been a codefendant in this case charged with the same counts and gang allegations levied against Madrigal. Pacheco had been promised leniency in exchange for her testimony at trial, and in exchange for her cooperation, she pleaded guilty to assault with a deadly weapon (§ 245, subd. (a)(1)) and accessory after the fact (§ 32), with gang enhancements on both counts. Pacheco was subject to a maximum term of 11 years in prison.

Counsel's declaration asserted the records could be potentially exculpatory by showing Pacheco had engaged in conduct or made statements that could be used to impeach her trial testimony and "shed light" on her veracity and credibility as a cooperating witness. Counsel asserted on information and belief that Pacheco may have been speaking to other persons about the case during the jailhouse phone calls, and counsel set forth numerous ways in which the records could assist her in preparing a defense.

No party moved to quash the subpoena, and the court received a disc containing the recordings. At a hearing on January 9, 2018, the court requested argument on the materiality or relevance of the documents. At the hearing, counsel asserted that in her experience in criminal cases, people often make statements in jailhouse phone calls showing they had lied in prior statements or would lie in exchange for consideration from the prosecution. Counsel also asserted Pacheco had given several interviews to police, both before and after being offered a plea agreement in exchange for her testimony, and that her subsequent statements changed substantially from prior statements. The prosecution objected to release of the phone calls on the grounds the defense had failed to show good cause. At the conclusion of the hearing, the court ruled that it would take the matter under submission and review the records.

At a hearing on January 18, 2018, the court stated the disc contained files but that the court was unable to access them.[9] The court ruled it would not release the recordings, but that defense counsel could request further review on "something specific" in the future. Based on the court's statement that it had been unable to access the recordings, defense counsel asked the Department of Correction to provide another disc.

Madrigal then moved in limine for discovery of the records under section 1054.1 and *Brady v. Maryland* (1963) 373 U.S. 83. The prosecution opposed the discovery

---

[9] The prosecution advised the court that the discs usually include an application that would need to be installed to listen to the calls.

40

motion on the grounds the defense had failed to set forth good cause. The court addressed the matter at a hearing on in limine motions on February 7, 2018. Defense counsel represented that the police had questioned Pacheco about her communications with Enrique Martinez, and that Pacheco told police she had discussed the case with him on the phone. The prosecutor conceded that Pacheco and Martinez had discussed the case, but he asserted this occurred while they were both in custody, and not through jailhouse phones. The court ruled that it would review the materials, but "if this is a huge population of something" that the court could not review "easily . . . and quickly," then the court would probably ask for "further clarification on terms to identify what may be relevant."

The next day, the court informed the parties it had looked at the disc with the phone calls. The court said it was "unable to open them for the purpose of listening to them," but the disc contained "hundreds of calls" with a maximum length of 15 minutes. The court stated, "I am not going to review hours and hours and hours of phone calls. If there's some further indication of a particular phone number that was called or a particular date or time, then . . . I think that that might be something we can address. [¶] But, at this time, it seems too speculative to me, and it's a very large universe of phone calls without further clarification as to what date, time, or number may be relevant."

When the prosecution listed Pacheco as a potential witness in its trial brief, defense counsel moved for reconsideration. The trial court denied the motion, ruling that counsel's grounds amounted to "pure speculation" and there was no indication the records would contain the information she sought.

### 2. *Legal Standards*

A criminal defendant has a right to discovery by a subpoena duces tecum of third party records by "demonstrating the requested information will facilitate the ascertainment of the facts and a fair trial. [Citations.]" (*Pitchess v. Superior Court* (1974) 11 Cal.3d 531, 536 (*Pitchess*); *People v. Superior Court* (*Barrett*) (2000) 80 Cal.App.4th

1305, 1316 (*Barrett*).) "When a defendant has issued a subpoena to a person or entity that is not a party for the production of books, papers, documents, or records, or copies thereof, the court may order an in camera hearing to determine whether or not the defense is entitled to receive the documents." (§ 1326, subd. (d).)

Defense counsel "may issue a criminal subpoena duces tecum, and, unlike civil subpoenas, there is no statutory requirement of a ' "good cause" ' affidavit before such a subpoena may be issued. [Citations.]" (*Facebook, Inc. v. Superior Court* (*Touchstone*) (2020) 10 Cal.5th 329, 343-344 (*Facebook*).) However, "a criminal subpoena does not command, or even allow, the recipient to provide materials directly to the requesting party." (*Id.* at p. 344.) "[T]he sought materials must be given *to the superior court* for its in camera review so that it may 'determine whether or not the [requesting party] is entitled to receive the documents.' [Citations.]" (*Ibid.*)

To acquire the materials, the defendant must make a showing of good cause—that is, specific facts justifying discovery. (*Barrett*, *supra*, 80 Cal.App.4th at p. 1318; *Millaud v. Superior Court* (1986) 182 Cal.App.3d 471, 475.) " '[T]he good cause requirement embodies a "relatively low threshold" for discovery.' [Citation.]" (*People v. Gaines* (2009) 46 Cal.4th 172, 182 (*Gaines*).) It requires " 'some cause for discovery other than "a mere desire for the benefit of all information." ' " (*Facebook*, *supra*, 10 Cal.5th at p. 344.) An accused is entitled to any " 'pretrial knowledge of any unprivileged evidence, or information that might lead to the discovery of evidence, if it appears reasonable that such knowledge will assist him in preparing his defense. . . .' [Citation.]" (*Ballard v. Superior Court* (1966) 64 Cal.2d 159, 167 (*Ballard*).)

As part of the good cause showing, a defendant has the burden to show a "plausible justification" for inspection. (*Facebook, supra*, 10 Cal.5th at p. 329; *Hill v. Superior Court* (1974) 10 Cal.3d 812, 817-818; *Ballard, supra*, 64 Cal.2d at p. 167.) In assessing whether this burden is satisfied, we consider whether defense counsel has presented "specific facts demonstrating the subpoenaed documents are either admissible

or might lead to admissible evidence" that will reasonably assist counsel in preparing a defense. (*Facebook*, at p. 345.) Furthermore, the documents must be "requested with adequate specificity to preclude the possibility that defendant is engaging in a 'fishing expedition.' " (*Pitchess, supra,* 11 Cal.3d at p. 538.)

"The People, even if not the target of the discovery, also generally have the right to file a motion to quash 'so that evidentiary privileges are not sacrificed just because the subpoena recipient lacks sufficient self-interest to object' [citation] or is otherwise unable to do so. [Citation.] Even where the People do not seek to quash the subpoena, the court may desire briefing and argument from the People about the scope of the third party discovery." (*Kling v. Superior Court* (2010) 50 Cal.4th 1068, 1078.) (See also *People v. Nieves* (2021) 11 Cal.5th 404, 433 [a trial court may entertain argument from the opposing party on third party discovery and a prosecutor's submission of argument in such a matter is not improper].)

We review the trial court's ruling for an abuse of discretion. (*Facebook*, *supra*, 10 Cal.5th at p. 359.)

### 3. *The Trial Court Erred by Refusing to Review or Release the Records*

Madrigal subpoenaed the records more than two months before the start of trial, and the Department of Correction readily produced them to the superior court. No party moved to quash the subpoena. The Attorney General does not claim Madrigal's subpoena was untimely, and nothing in the record would support such an assertion. No party contends, and the trial court did not find, that release of the materials would intrude upon any protected governmental interest, or violate any right of confidentiality, privacy, or evidentiary privilege.

The trial court at various times cited different reasons for its decision, ruling that defense counsel's showing of good cause was insufficiently specific; too speculative; failed to show the relevance of the records; and failed to show the records would contain the information she sought. The court stated that the records produced were too

43

voluminous for the court to review quickly and easily, and that it would not review "hours and hours" of phone calls. Ultimately, the court ruled it would not release or even review the records because counsel's request was not specific enough to identify a small volume of records that the court could review quickly and easily to determine whether they contained anything relevant.

The Attorney General argues the trial court "reasonably conditioned review and potential release on greater specificity, which never came." The Attorney General argues that defense counsel, by failing to narrow the scope of her request, showed she was engaged in an impermissible "fishing expedition." As to the trial court's refusal to even review the records, the Attorney General argues the trial court had no duty to listen to the calls and "go on appellant's fishing expedition for him."

We first consider whether defense counsel demonstrated a "plausible justification" for acquiring the documents. This is the "most significant" consideration, and "should be given prominence." (*Facebook*, *supra*, 10 Cal.5th at p. 345, fn. 6.) Defense counsel accurately characterized Pacheco as "one of the main witnesses for the prosecution." In multiple interviews with the police, Pacheco admitted she was driving the van at the time of the assault, and she made numerous statements specifically describing Madrigal's role as well as what he said immediately before and after the incident. Defense counsel accurately pointed out that Pacheco had changed her statements over the course of multiple interviews with police, including statements during a proffer session after which the prosecution offered her a plea agreement. Counsel further represented that Pacheco had written a letter about the case to another defendant (Enrique Martinez, who was allegedly in the van) while the two were in custody, and that she had spoken with him on the phone. The prosecutor conceded Pacheco had written the letter, and he argued the phone calls were made during a different time frame, but he did not refute that Pacheco had spoken to Martinez on the phone. All of these facts provided a reasonable basis for defense counsel to seek Pacheco's statements.

44

The trial court ruled that counsel had failed to show the information she sought was actually in Pacheco's jailhouse phone calls. But defense counsel is not required to show the information she seeks is actually in the subpoenaed materials. "No showing by the defendant that the material sought actually exists or that it would be admissible as evidence at trial is required. [Citations.]" (*People v. Coyer* (1983) 142 Cal.App.3d 839, 842 (*Coyer*).) The defendant is entitled to "information that might lead to the discovery of evidence, *if it appears reasonable that such knowledge will assist him [or her] in preparing his [or her] defense. . . .*' [Citation.]" (*Ballard, supra,* 64 Cal.2d at p. 167.)

Defense counsel argued that in her experience defendants in custody often discuss their cases on the phone. We also think it plausible that Pacheco discussed the case during her jailhouse calls.[10] The Attorney General, citing *People v. Windham* (2006) 145 Cal.App.4th 881 (*Windham*), implies it is unlikely Pacheco would have discussed the case on the jailhouse phones because inmates are warned their calls may be recorded and monitored. (*Id.* at p. 885.) But that is exactly what the defendant in *Windham* did. Windham was charged with domestic violence, and while in custody, he "attempted to call [the victim] 83 times on the jail telephones. Twelve completed conversations to [the victim] included some references to the events leading to Windham's arrest." (*Id.* at p. 884.) This is hardly an uncommon phenomenon. A cursory search of the case law yields hundreds of opinions involving defendants making statements about their cases on jailhouse phones, often providing evidence to support their convictions.

Given the relevance of Pacheco's testimony and her history of contradictory statements, it is plausible that if she made statements about the case during jailhouse phone calls, defense counsel could use them to impeach Pacheco's testimony, undermine

---

[10] Although defense counsel did not rely on these facts, we note that Pacheco's brother Torres was also a defendant in the case, and Pacheco's cousin Nieto testified that she too was present in the van. On this record, Pacheco had many opportunities to discuss the case on jailhouse phones.

45

her credibility, or use them to discover exculpatory evidence. We conclude the materials Madrigal sought might have led to the discovery of evidence that would have assisted him in preparing his defense. (*Ballard, supra,* 64 Cal.2d at p. 167.)

The Attorney General argues defense counsel's request was insufficiently specific because it resulted in records too voluminous for the court to review them quickly and easily. This claim relies on two faulty premises. First, the fact that a request for records yields a large volume of them does not by itself show the request was overbroad. The requirement of specificity applies to counsel's description of the information sought, not the volume of records it produces. (*Facebook*, *supra*, 10 Cal.5th at p. 348 [the defendant must " 'describe the requested information' " with at least some degree of specificity].) Here, the subpoena specified all calls made on one jail's phones by one specific person over a specifically defined time frame. This request was sufficiently specific.

It is true that a large volume of materials may be *indicative* of an overbroad request, but that is less true today than in the past. In *People v. Serrata* (1976) 62 Cal.App.3d 9, the defendant issued subpoenas to the IBM Corporation, and the trial court granted IBM's motion to quash. (*Id.* at p. 14.) The Court of Appeal held the trial court properly quashed the subpoenas as a "broad, blanket demand for documents" that "amounted to nothing more than a fishing expedition." (*Id.* at p. 15.) One of the subpoenas "called for the production of 'literally millions of pieces of paper' which were located at IBM plants throughout the world and which constituted the work product of numerous teams of experts and scientists who had devoted as much as four or five years to the development of the sixteen complex computer devices which were the subject of the subpoenas." (*Id.* at p. 15.) Here, defense counsel's subpoena did not call for the

production of millions of pieces of paper located throughout the world. The requested phone calls were gathered from one place and readily produced in digital form on disc.[11]

Technology has evolved considerably since the IBM era of 1976. Computers, smart phones, email, texts, and the Internet now give ordinary persons the ability to generate large volumes of digital records. And the custodians of those records typically have the capacity to store and retrieve even larger volumes. As a consequence, even a highly specific request can result in a large number of digital documents, and modern-day litigants routinely engage in discovery productions with mindbogglingly large volumes of records. The burdens of this fall on defendants as well as courts and prosecutors. (See *U.S. v. Stein* (S.D.N.Y. 2006) 461 F.Supp.2d 201, 203 [considering the burdens placed on defendants by large volumes of discovery].) Fortunately, for some, litigation support technology provides a multitude of powerful applications for managing and reviewing digital records.

Unfortunately, it appears the trial court here was unable or unwilling to review any of the subpoenaed phone calls. Law enforcement agencies, on the other hand, often have the capacity to retrieve, review, and search over large volumes of digital records. (See, e.g., *Windham*, *supra*, 145 Cal.App.4th 881.) It may be that Madrigal's counsel had similar technology, but if she did, she was hamstrung by the trial court's outright refusal to review or release the records.

That brings us to the second faulty premise in the Attorney General's position: that the trial court's inability to easily review the documents justified its refusal to release them. The Attorney General cites no authority for the proposition that a defendant's request for records must be specific enough to allow trial courts to review them quickly and easily, and we are aware of no such authority. Nor *could* that be a legitimate

---

[11] If the subpoena had placed an unjustified burden on the Department of Correction, it could have moved to quash the subpoena on that ground. (*Facebook, Inc. v. Superior Court (Hunter)* (2020) 46 Cal.App.5th 109, 119.)

condition for release of the documents absent any other conditions. If Pacheco's calls consisted of "hours and hours and hours" of statements helpful to Madrigal's defense, he would be entitled to them despite their volume.

The Attorney General argues the trial court had no legal duty to review the documents. That may be so, but the court could have released them anyway. As a general matter, a trial court's decision whether to review subpoenas documents is discretionary, not mandatory. Upon receiving the subpoenaed documents, "the court *may* order an in camera hearing to determine whether or not the defense is entitled to receive the documents." (§ 1326, subd. (d).) (See *People v. Hammon* (1997) 15 Cal.4th 1117, 1122 [trial court was not required to review subpoenaed documents].) While certain circumstances may necessitate or require in camera review, there were no such circumstances here. This was not a *Pitchess* motion for the personnel records of peace officers. There is nothing in the record to suggest that release of the materials would harm any legitimate governmental interest, or violate any right of confidentiality, privacy, or evidentiary privilege. And as set forth above, Madrigal made the required showing of good cause for their release. We see nothing in the statutes or case law that would have prohibited the court from releasing the records without conducting an in camera review.

While the trial court had the discretion to review the records, it refused to do so because the review would take too long. The court could have released the documents without reviewing them, but it refused to do that too. Once the defendant showed good cause for release of the documents, the trial court erred by refusing to release them on the ground it could not review them quickly and easily. We hold this constituted an abuse of discretion.

### 4. *Conditional Reversal and Remand*

The proper remedy for this type of error is a conditional reversal with directions to the trial court to review the requested documents in chambers on remand. (*Gaines*, *supra*, 46 Cal.4th at pp. 180-181 [when a trial court fails to review the documents at all,

48

remand to the trial court is appropriate].)  The Attorney General nonetheless contends any error was harmless because Pacheco's testimony was "inconsequential."  He points out that the prosecutor in closing argument disavowed her testimony that Madrigal admitted stabbing Harvey.  The Attorney General argues the jury must have discredited her testimony, so it would not have mattered even assuming defense counsel could have impeached Pacheco with her jailhouse calls.  He argues that even if Pacheco expressly admitted in a jailhouse call that she lied about Madrigal confessing to the stabbing, such an admission would not have changed the outcome of the trial.

But Pacheco gave other testimony the prosecutor relied on in closing argument. Pacheco admitted she was driving the van at the time of the assault.  She was the only witness whose testimony about the van turning around prior to the attack was consistent with the videos.  As set forth above, she testified that she drove down Southside Drive, and after the group of males got out at a stop sign on Water Street, she made a U-turn, drove back to Hope Street, turned right down Hope Street, made another U-turn, and waited there on Hope Street for the males to return.  The prosecution relied on this testimony as evidence the group was intentionally stalking Harvey prior to the attack. While the prosecution introduced video evidence from cameras stationed at a guard shack across from Hope Street, the videos by themselves did not clearly establish the van's movement.  The videos showed vehicle lights moving back and forth on Southside Drive, and arguably one set of vehicle lights showed a vehicle turning around on Hope Street, but the poor quality of the videos and the glare from a vehicle's headlights made it difficult to determine whether it was Pacheco's van in the videos.

Nieto's testimony about the movement of the van also failed to establish that it had turned around prior to the attack.  Similarly, a detective testified that Madrigal himself had drawn a map of the van route, but Madrigal's map showed the van turning left (northwest) off of Southside Drive onto Hope Street, making a U-turn, and turning left (northeast) back onto Southside Drive before turning right (southeast) down Water

49

Street.  Madrigal's description of the van's route cannot be reconciled with the movement of vehicle lights captured in the videos from the guard shack.

Furthermore, Pacheco was the only witness who testified it was Madrigal who told her to turn the van around and go back to Hope Street after stating something to effect that he "saw someone he didn't like."  The prosecution presented no other evidence to support the claim it was Madrigal who directed the movement of the van, or that he had any intent or plan to assault Harvey when the group got out of the van.

Additionally, Pacheco testified that she saw blood on Madrigal after the attack. She further testified that Madrigal told her he was in a gang, evidence the prosecution relied on to argue he was "holding himself out" as a gang member.  The prosecution argued that Madrigal's gang status gave him a motive to rob, and that as gang members, the attackers would not have randomly assaulted an ordinary person.  Echoing the prosecution's closing argument, the Attorney General embraces the same theories, and he relies on many portions of Pacheco's testimony to support them in the same fashion.

As explained in our analysis of the omitted felony murder elements above, we agree with the Attorney General's contention that Pacheco "testified dubiously"—a factor in our conclusion that the evidence of the omitted elements was not overwhelming.  But a rational juror could have credited her testimony.  In any event, we cannot say her testimony was "inconsequential."  Moreover, it is possible her jailhouse phone calls may lead to the discovery of evidence that would be helpful to Madrigal's defense apart from impeaching Pacheco.

On this record, it is impossible to assess prejudice from the failure to disclose the subpoenaed materials because we do not know what they contain, and the trial court made no record of their contents.  (See *Coyer*, *supra*, 142 Cal.App.3d at p. 844 [traditional harmless error analysis would be "speculative" where court of review could not determine whether compliance with discovery request would reveal the requested information].)  The proper remedy in this situation is to remand to the trial court.

50

(*Gaines*, *supra*, 46 Cal.4th at pp. 180-181.)  Accordingly, we will conditionally reverse the robbery conviction and remand the matter to the trial court for further proceedings as set forth below.

### C.  *Remaining Claims*

Madrigal raises numerous additional claims.  First, he contends the trial court erred by failing to instruct the jury on assault as a lesser included offense of robbery.  Second, he contends the court improperly instructed the jury on the specific intent required for an accomplice to robbery.  Third, he contends the court violated his due process rights by allowing the jury to convict him on the robbery count based solely on the uncorroborated testimony of an accomplice.  Fourth, he contends the court failed to instruct the jury on voluntary manslaughter as a lesser included offense of murder.  Fifth, he contends the court failed to instruct the jury on the requirement of unanimity as to the facts of the murder charge.  Sixth, he contends various fines and fees were imposed without finding he had the ability to pay them.  He further contends cumulative prejudice from multiple errors requires reversal.

Because we are reversing the judgment, we do not reach the merits of these claims.  In the event the trial court reinstates the robbery conviction on remand, Madrigal will not be precluded from raising the relevant claims again in any subsequent appeal.

### III.    DISPOSITION

The judgment is reversed.  The first degree murder conviction on count 1 is vacated, the matter is remanded for further proceedings consistent with this opinion, and the second degree robbery conviction on count 2 is reversed conditional on the outcome of the proceedings on remand.  On remand, the trial court shall either release the subpoenaed documents to Madrigal or exercise its discretion to review them in camera to determine whether any portion of them must be released.  If the trial court releases any portion of the subpoenaed documents, it shall allow Madrigal an opportunity to show prejudice.  If the trial court determines Madrigal was prejudiced by its previous failure to

51

release the documents, the trial court shall order a new trial on count 2, which may be joined with any retrial that may be held on other charges filed in this matter. If the trial court determines no documents must be released based on its in camera review, or that Madrigal was not prejudiced by the failure to release the documents, the trial court shall reinstate the judgment of conviction on the second degree robbery count.

_____
Greenwood, P. J.

WE CONCUR:


_____
Grover, J.


_____
Danner, J.


People v. Madrigal
H046577

| Trial Court: | Santa Clara County Superior Court<br>Superior Court No.: C1359219 |
| --- | --- |
| Trial Judges: | The Honorable Griffin M. J. Bonini<br>The Honorable Helen E. Williams<br>The Honorable Eric S. Geffon |
| Attorneys for Defendant and Appellant<br>JOEL MADRIGAL: | Cliff Gardner, under appointment by<br>the Court of Appeal, and Daniel<br>Buffington for Defendant and Appellant |
| Attorneys for Plaintiff and Respondent<br>THE PEOPLE: | Rob Bonta,<br>Attorney General of California,<br><br>Lance E. Winters,<br>Chief Assistant Attorney General,<br><br>Julie L. Garland,<br>Assistant Attorney General,<br><br>Michael P. Pulos and Joseph Christian<br>Anagnos,<br>Deputy Attorneys General |

H046577
People v. Madrigal